[Crim. No. 4243. Second Dist., Div. Two. Feb. 18, 1949.]

THE PEOPLE, Respondent, v. VIRGINIA MACIAS GARCIA, Appellant.

David C. Marcus for Appellant.

Fred N. Howser, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

McCOMB, J.—From judgments of guilty on two counts of violating section 274[1] of the Penal Code (employing means

---

[1]Section 274 of the Penal Code reads as follows: ''Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than two nor more than five years.''

to procure miscarriage), after trial before the court without a jury, defendant appeals.

The record discloses these facts:

By stipulation of counsel, defendant personally consenting thereto, the People's case was submitted on the transcript of the preliminary examination. The People having rested, defendant did not offer any evidence and also rested.

The preliminary transcript discloses that the complaining witness testified that on or about October 22, 1947, she was pregnant; that she went to defendant's home and gave her $65 for the purpose of having an abortion performed upon her; that thereafter defendant told her to remove a portion of her underclothing and to lift up her legs and put them on the bed, and that she did so; that defendant put an instrument into her private parts and poured a medicine into them; that this instrument remained there for about 30 minutes during which time it hurt her; that this same process was repeated a few days later. Shortly thereafter the prosecuting witness became very ill and was taken to a hospital where she gave birth to a baby.

Dr. George H. Ham testified that he examined the complaining witness when she came to the hospital on October 29, 1947, and that she was pregnant and in a condition of threatened abortion or miscarriage or premature labor.

The other complaining witness testified that on or about October 29, 1947, she was pregnant and with her mother went to defendant's home where they asked defendant to perform an abortion. This she agreed to do and they gave her $125, whereupon the witness went into a bedroom with defendant who directed her to lie upon the bed and put her legs on top of it; that after her underclothing was removed defendant put an instrument inside her private parts and swabbed her with cotton; that after the instrument was removed she started to bleed and defendant gave her some castor oil. The following day the police removed the witness to the hospital where she was examined by Dr. Meier. The doctor stated that an examination disclosed that she was bleeding from the vagina, uterus; that she was approximately three months pregnant; and that the mouth of the womb was dilated approximately one centimeter.

He further stated that the hemorrhage was brought on prematurely and indicated the beginning of an abortion.

Similar testimony was given by Dr. Leslie C. Grant, who testified that in his opinion the witness was at the time of examination "an incomplete abortion."

## DEFENDANT'S CONTENTIONS

**First**: *The trial court was without jurisdiction to pronounce judgment and sentence because there was nothing in the record to indicate that the preliminary transcript was: (1) ever introduced in evidence, (2) read in evidence, (3) made a part of the superior court proceedings, or (4) that the court ever read the transcript of the preliminary proceedings.*

This contention is devoid of merit for the reason that the reporter's transcript[2] of the proceedings in the superior court refute each of the foregoing contentions, since it says, "The following testimony heretofore given at the preliminary hearing in this case was read into the record in open Court, as follows, to wit: (The testimony was then read into the record.) . . ."

The foregoing statement shows that the transcript of the preliminary hearing was received in evidence and considered by the trial judge.

**Second**: *The testimony of the two complaining witnesses was not sufficiently corroborated by other evidence as required by section 1108 of the Penal Code.*[3]

This proposition is also without merit in view of the settled rule that admissions and declarations of the defendant constitute corroborative evidence of the testimony of a woman who is the subject of an attempted abortion. (*People v. Richardson*, 161 Cal. 552, 557 [120 P. 20]. See also *People v. Malone*, 82 Cal.App.2d 54, 68 [185 P.2d 870]; *People v. Sullivan*, 144 Cal. 471, 473 [77 P. 1000]; *People v. Armstrong*, 114 Cal. 570, 573 et seq. [46 P. 611].)

In the instant case the record discloses that defendant

---

[2]Reporter's transcript, page 5, lines 5 to 7.

[3]Section 1108 of the Penal Code reads thus: "Upon a trial for procuring or attempting to procure an abortion, or aiding or assisting therein, or for inveigling, enticing, or taking away an unmarried female of previous chaste character, under the age of eighteen years, for the purpose of prostitution, or aiding or assisting therein, the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence."

admitted to officer Sylvas that she had attempted to abort each of the complaining witnesses.[4, 5]

In view of defendant's admissions, the foregoing rule is applicable and each of the complaining witnesses' testimony finds corroborative evidence in the record sufficient to sustain the convictions.

The judgments are and each is affirmed.

Moore, P. J., and Wilson, J., concurred.

[4]Officer Sylvas testified among other things that defendant had said to him, ''that the girl [one of the complaining witnesses] had been over there and begged her to perform an operation on her, and she didn't want to, but she finally did, and she told this girl, Martha, that if she had a baby, she would put it in an incubator, and so when we got to her house I said, I don't see any facilities here for an incubator, and I said just where were you going to put it, and she said I would have arranged to have it some way, and I said later, I understand this girl's name is Bertha not Martha, the chubby girl with the glasses, and she said, something like that; and then I asked her about another girl named Pertha Paris, and she said I haven't seen that girl for some time, she wanted me to do the same thing on her body, but I didn't do it, and she finally had the baby, never got married, but she has been gone over a year, and the last I heard of her she was somewhere in Los Angeles.''

[5]Officer Sylvas testified relative to defendant's admission regarding the other complaining witness as follows: ''Finally we asked her in the presence of one of the witnesses, . . . , if she had been at the house of the defendant, and she stated she had. Then, we asked Mrs. Garcia if she had done anything on the body of Sally Pineda. At this time the defendant pointed at Sally and said she will tell you if I did anything, and I said we want you to tell us if you did, and at this time the defendant said, whatever Sally tells you is the truth. Well, we asked her wasn't Sally at your house on the 29th of October and she said yes. Did you see anyone else with her, she said, I believe her mother was with her and Frances Mendosa. At this time we asked her did they give you any money. At that time she said, what money; well, we asked, didn't somebody give you any money for some purpose? And she said yes, the girl and the girl's mother. We said what was the money for; well, it was in order to treat Sally, so she wouldn't have a baby. And I said what do you mean by that, and she stated well, to have her get a miscarriage, and I said how much money did they give you and she said $125.00 and I said, what was the $125.00 for; well, she said $60.00 was for the abortion, and $65.00 for the medicine. I asked her this $125.00 didn't cover the whole fee for the abortion alone, and she said, no, because part of it was for room and board and their laundry if they stayed overnight, or should happen to stay in more than two days or so, but the other part was for the medicine. Then I asked her where did Sally sleep the night she was at your house, and she said in the front room on the davenport. At this time I asked her, well do you recognize any sheets that I show you here, and she said, well the sheet is mine that was on the bed where Sally slept. She identified that sheet that is on the desk there. Then about the rubber sheet she said that was mine too, that was under the bed. Then we started to question her about the money that we found in the house, . . . well where did you put the money Sally and her mother gave you, and she said, I placed it right on top of the whole set and we asked her, do you remember what denominations they were, and she said I am not sure, but there were some twenty dollar bills, and five dollar bills, and she said I think there were five one dollar bills.''